FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 1 0 2018 ★

BROOKLYN OFFICE

### U.S. DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

**AZRACK, J.**

**SHIELDS, M.J.**

|  |  |
|---|---|
| THOR HALVORSSEN | ) |
|  | ) |
| v. | ) |
|  | ) |
| GLENN R. SIMPSON, | ) |
| PETER FRITSCH, | ) |
| FRANCISCO D'AGOSTINO-CASADO, | ) |
| LEOPOLDO A. BETANCOURT-LOPEZ, | ) |
| PEDRO JOSE TREBBAU-LOPEZ, | ) |
| FRANCISCO CONVIT-GURUCEAGA. | ) |

**CV 18- 2683**

Case No. _____

JURY TRIAL REQUESTED

## COMPLAINT

Plaintiff, Thor Halvorssen ("Halvorssen") asserts claims against the Defendants for damages he has incurred as a result of their conspiracy to retaliate against him for reporting crimes to federal authorities. The goal of the retaliation was to get Halvorssen fired as President of the Human Rights Foundation ("the Foundation"). Because the Defendants have a history of prior retaliations through Fusion GPS, this case is brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961-1968 ("RICO").

### I.      Introduction

1. Halvorssen is a prominent human rights advocate. He has a track record as a fierce campaigner in his advocacy of transparency in government and against corruption. He is an outspoken and continuous critic of corruption in his native Venezuela and has been interviewed hundreds of times on the subject.

2. Additionally, he has lectured widely and participated in multiple documentary projects about human rights violations and corruption cases in Venezuela, the largest of which was the illicit business of Derwick Associates ("Derwick"), a Venezuelan

company engaged in the construction of electric power plants.  Derwick is owned by Francisco D'Agostino-Casado ("D'Agostino"), Leopoldo Alejandro Betancourt-Lopez ("Betancourt"), Francisco Antonio Convit-Guruceaga ("Convit"), and Pedro Jose Trebbau-Lopez ("Trebbau" and collectively they are referred to as "the Venezuelans").

3. After Halvorssen reported that the Venezuelans had committed numerous federal crimes in conjunction with Derwick, they retaliated against him through Fusion GPS. Glenn Simpson and Peter Fritsch, Fusion GPS's principals, were hired to produce a false dossier and a media campaign (including a social media campaign) to depict Halvorssen as a pedophile, heroin addict, and embezzler of the Foundation's money. That effort has cost Halvorssen millions of dollars.  He now sues for damages under RICO.

II.    Parties, Jurisdiction, and Venue

4. The Court has jurisdiction as a federal question pursuant to RICO's civil damages provision, 18 U.S.C. §1964(c) and 28 U.S.C. §1331.

5. The Court has general jurisdiction over Simpson and Fritsch as U.S. citizens and because of their participation in the conspiracy which was initiated and carried out in this district.

6. The Court has specific jurisdiction over the Venezuelans based on their significant contacts with the U.S., detailed below, and the fact that this case arises from at least one of those contacts, the conspiracy with Fusion GPS.

   a. D'Agostino:  He owns a home in Southampton, New York, where he formed the conspiracy to retaliate against Halvorssen in 2015.  He also

2

belongs to a Manhasset golf club, rents a second home in Manhattan, and has been represented since 2015 by the New York law firm Susman Godfrey LLP and a New York public relations firm, Kekst and Co. He has spent most of the last several years residing in New York. His wife is a lawful permanent resident alien of the U.S. and at least one of their children is a U.S. citizen. All of their children attend schools in New York. He has a U.S. cellphone number.

b. Betancourt: He regularly travels to the U.S. to conduct business. He is the beneficial owner of a $12 million penthouse apartment at the famed Olympic Tower on Fifth Avenue in Manhattan. In 2014, Betancourt retained Adam Kaufmann of the New York firm Lewis Baach Kaufmann Middlemiss PLLC as public relations counsel, and that representation is ongoing. He is also the beneficial owner of an apartment in Sunny Isles Beach, Florida. In 2017 Betancourt formed and incorporated a business entity in the U.S., Hawkers USA. In October of 2017, Betancourt became a client of Washington, D.C. lobbyist Brian Ballard. Betancourt was represented by the New York law firm, Lankler, Siffert, and Wohl, from 2015-2017.

c. Trebbau: He is the beneficial owner of a condominium in Sunny Isles Beach, Florida, where he spends a significant amount of time and maintains a car which is titled by the State of Florida at that address. Trebbau was issued a marriage license by the State of Florida, and his wife is a lawful permanent resident alien of the U.S. He has a Florida

3

drivers' license and an F.A.A. pilot's license. He was represented by
the New York law firm Fox, Rothschild LLP from 2015-2017.

d. Convit: He owns a home in Hollywood, Florida. He also has multiple
bank accounts in the United States and frequently travels to the U.S. to
conduct his business affairs. Since January 2014, Convit has also been
represented by Adam Kaufmann of the New York law firm Lewis
Baach Kaufmann Middlemiss PLLC.

7. Venue is proper pursuant to 18 U.S.C. §§1965(a) and (b) as well as 28 U.S.C.
§1391(b) because part of the scheme to retaliate against Halvorssen was carried out
from D'Agostino's home in Southampton, New York. All of the other defendants
joined in this conspiracy at D'Agostino's urging. Therefore, they can all be sued in
this action. There is no other district where venue could be obtained over all
defendants. All defendants should be tried together to avoid the possibility of
inconsistent verdicts and to conserve judicial resources.

III.    The Venezuelans Pay Kickbacks for Derwick's
Contracts to Build Venezuelan Power Plants

8. Derwick has received billions of dollars in the last eight years through overbilling the
government of Venezuela for the construction of electric power plants. While it is
generally understood that Venezuela is rife with corruption, there has been nothing
quite like Derwick. It began with little capital and no engineering prowess, hardly an
enterprise to be tasked with building massive power plants to modernize Venezuela's
aging electric grid. Its principals were in their twenties and early thirties, lacked any
experience in the energy sector, had not distinguished themselves academically nor in

any prior business, nor in any aspect of their short lives. All they had was an idea and the right connections to corrupt government officials.

9. Derwick's business model relies upon two corrupt measures: kickbacks to government officials for the power plant contracts and gross overbilling to the government, as much as 400% above costs.

10. Once Derwick has been paid by the government on a particular contract it kicks back large sums of money to Venezuelan government officials, including Vice Minister of Electric Development Javier Alvarado Ochoa, for their part in obtaining it.[1]

11. Halvorssen began to investigate reports of these kickbacks in 2011. It progressed to the point where he was able to have telephone calls and a face-to-face meeting with D'Agostino in 2013. In this meeting D'Agostino acknowledged being an owner of Derwick and stated that the owners paid kickbacks disguised as "consulting fees" to Venezuelan public officials. To D'Agostino this was simply a cost of doing business. "In many places it's more legalized, in others less legalized," he said matter-of-factly. "You always have to pay."

12. Thereafter, Halvorssen uncovered many more details about Derwick's procurement of equipment, how the overbilling is disguised, how its ill-gotten profits are laundered and how the Venezuelans have flaunted their enormous wealth in this country.

---

[1] One kickback was arranged by Betancourt and Trebbau. The money was paid via JP Morgan in New York to the Banca Privada D'Andorra, in the tiny nation of Andorra, which has more lax currency rules. Another kickback deal was arranged by Convit and D'Agostino with a $25,000,000 bribe being paid to another government official, Nervis Villalobos, in 2012. The construction contracts were not obtained through any open bidding process. Upon securing the grossly inflated contracts, Derwick then subcontracted the work to Missouri-based ProEnergy Services. Beyond the construction, Derwick also procured the turbines and equipment for the power plants. These were sourced second-hand through a subcontractor and then sold as new at grossly inflated prices. It is estimated the total value of all the contracts was $2.9 billion.

IV.    Halvorssen Reported the Bribes, Kickbacks and
Money Laundering to U.S. Government Officials

13. Halvorssen has spent his 20-year career promoting peaceful resolution of world issues

through such initiatives as the Oslo Freedom Forum and through the Foundation's

core programs, which focus on freedom of expression, the plight of political

prisoners, exposing the enablers of dictatorships, human rights education, and the

disruption of authoritarian regimes like Cuba and North Korea.

14. Halvorssen seeks to uncover corruption around the world, as corruption is the engine

behind most human rights violations. As such, he has exposed corruption in

Kazakhstan, Equatorial Guinea, Angola, and Syria. Halvorssen is also a native of

Venezuela and has taken a strong interest in corruption and human rights violations in

that country. He has testified before the British Parliament, the Canadian Senate, the

United Nations Human Rights Council and the U.S. Senate. His writings have been

published in the Atlantic, Foreign Policy, the New York Times, the Wall Street

Journal, and the Washington Post. He is a frequent commentator on the subject of

corruption on ABC, CBS, CNN, Fox News, MSNBC, and NBC.

15. In July 2015, Halvorssen became a shareholder of Harvest Natural Resources, Inc.

("Harvest"), a Texas-based energy company. He did so to engage in anti-corruption

shareholder activism. In August 2015, he wrote to Harvest's board of directors to

bring to their attention that a candidate to the board of directors, D'Agostino, had

played a role in Derwick's bribery and warned of the possibility that D'Agostino was

a liability to the future of Harvest. Halvorssen met with the C.E.O. and several senior

officers of Harvest, including the Harvest general counsel, to express his concerns.

Additionally, Halvorssen attended the annual shareholder meeting in Houston and

made his views about D'Agostino known to several key shareholders of Harvest. The letter is attached as Exhibit A.

16. Subsequently, and at Halvorssen's urging, Harvest engaged a prominent outside law firm, King & Spaulding LLP, to carry out an internal investigation. The lead attorney in the investigation was Michael J. Biles, head of the firm's Foreign Corrupt Practices Act ("FCPA") group. Biles interviewed Halvorssen over the telephone on several occasions and in person for five hours, reviewed extensive evidence over a period of several weeks, and concluded that Halvorssen was a "credible witness." As a result of Halvorssen's efforts, D'Agostino was forced to resign from the Harvest board of directors several weeks after having been elected.

17. Harvest subsequently filed the necessary documents with the Securities and Exchange Commission to announce D'Agostino's sudden resignation.

18. Halvorssen's letter stated D'Agostino had confessed as follows:

> D'Agostino has told me that he and his associates, through Derwick, have made bribery payments to Venezuelan officials in connection with the award of certain government energy contracts there. Beyond what Mr. D'Agostino has told me, the Derwick companies stand accused of engaging in illegalities in Venezuela in the construction of power plants, and of siphoning more than one billion dollars intended to build the power plants into bank accounts in Andorra, Canada, Panama, Spain, and the United States. According to a story in the Wall Street Journal, the enterprise operating as "Derwick" is currently under investigation by the United States Department of Justice and by the Manhattan District Attorney's Office. Derwick is also under investigation by Sepblac, Spain's Financial Intelligence Unit and Anti-Money Laundering Supervisory Authority. *See* Ex. A.

19. The letter further accused D'Agostino and the other Venezuelans of violating numerous federal laws including the FCPA and money laundering statutes. *See* Ex. A.

20. Halvorssen copied various federal law enforcement officials: Preet Bharara, U.S.

Attorney's Office for the Southern District of New York; Andrew M. Calamari,

Enforcement Division, Securities and Exchange Commission; Leslie R. Caldwell,

Criminal Division, U.S. Department of Justice; Amelia Cottrell, Enforcement

Division, Securities and Exchange Commission; Peter Edge, Homeland Security

Investigations, U.S. Immigration and Customs Enforcement; Howard Fischer, Senior

Trial Counsel, Securities and Exchange Commission; Jennifer Shasky Calvery,

Financial Crimes Enforcement Network, U.S. Department of the Treasury; and

Wendy B. Tepperman, Enforcement Division, Securities and Exchange Commission.

Copies of the letter were sent to them by mail. *See* Ex. A.

21. Halvorssen also provided a copy of the letter to D'Agostino as a shareholder and

investor of Harvest.

22. Since then various jurisdictions have acknowledged ongoing criminal inquiries into

Derwick's alleged crimes: the U.S. Attorney's Office for the Southern District of

New York, banking authorities in Switzerland, and now Spain's government, an

investigation which was reported just days ago in Spain's *El Mundo* newspaper.

23. These recent inquiries vindicate Halvorssen's charges made in 2015.

V.    The Venezuelans Hire Fusion GPS to Retaliate
      Against Halvorssen by Creating and Publishing a
      Vile "Profile" of Him

24. In August 2015, D'Agostino discussed Halvorssen's letter with the other Venezuelans

by telephone from his home in Southampton, New York.  Incensed about the Harvest

8

Natural Resources fiasco and afraid Halvorssen would continue his efforts to expose the Derwick bribes, he insisted they take immediate action.

25. In a series of calls over a few days they agreed to engage Fusion GPS, which had been working for Derwick for more than one year, to undertake an effort to smear Halvorssen. Simpson and Fritsch recommended that Fusion GPS compile a dossier on Halvorssen which would consist not only of his public writings, but also negative information from individuals who had an axe to grind against him, such as the Venezuelan government and state-run enterprises in other nations he had criticized as President of the Foundation.

26. Then, Simpson and Fritsch promised to pass along the dossier to friendly journalists who would use the negative information, even if the information came from hostile sources and not for attribution, into a profile of Halvorssen for wide publication in the media and particularly on the internet. And they further agreed to use search engine optimization techniques so that the profile would appear at or near the top of any internet searches for Halvorssen or the Foundation. They promised the Venezuelans that the profile would clearly implicate Halvorssen in unethical and illegal conduct as President of the Foundation, even though none of them possessed actual knowledge of such conduct. Simpson and Fritsch assured them such allegations would be produced.

27. Thus, the result, they all hoped, would be that the Foundation would have to fire Halvorssen. That would effectively kill two birds with one stone. Halvorssen would be discredited, and the Foundation, if it survived, would be loath to talk about Derwick ever again.

28. D'Agostino was absolutely giddy about what he had set in motion.  He told a colleague, Alessandro Bazzoni, that he was going to "destroy" Halvorssen, whom he detested more than any other individual because of what he had exposed.

29. They all agreed to the plan, and the Venezuelans paid Fusion GPS to compile the dossier.  Simpson personally oversaw the effort, as he does with all the firm's research jobs.

30. Fusion GPS encountered difficulty in compiling derogatory information on Halvorssen.  Nobody would provide such information for attribution because the allegations Fusion GPS wanted to publicize were false.  So "sources" were promised anonymity and encouraged to exaggerate and speculate.  Fusion GPS either found someone who invented a story that Halvorssen regularly used heroin, had been in rehab, and was high at Foundation events, or it invented the story out of whole cloth.  And it did the same thing with allegations that Halvorssen embezzled money from the Foundation and had sex with minors in hotel rooms paid for by the Foundation.

31. In the end, Simpson and Fritsch were satisfied that their dossier contained ample allegations so that the Foundation would find it necessary to fire Halvorssen.

32. Simpson and Fritsch turned the dossier over to the Venezuelans, who loved it, and to a longtime friend and associate, Washington journalist Kenneth M. Silverstein.  They asked Silverstein if he would turn the dossier into a devastating profile of Halvorssen and publish it online.  Silverstein, an avowed supporter of the Chavez regime, likes to advance the interests of Fusion GPS' clients in his reporting. He agreed to do the profile. Sometimes Simpson gives him news tips involving his clients.

33. Silverstein is adept at turning a Fusion GPS dossier consisting of innuendo and unattributed charges into a juicy headline for clickbait.   Yet, he too tried to get corroboration from other sources to back up the scurrilous allegations of illegal drug use, pedophilia, and embezzlement in the Fusion GPS dossier.  He failed to do so, but published the story anyway without a single source being named.

34.  Silverstein's "profile" about Halvorssen, which Simpson, the Venezuelans, and Fritsch approved prior to publication, first appeared on the internet on September 28, 2015, in a British journalism site, Byline.com. The article was entitled: "Living High --Very High-- Off Human Rights: Thor Halvorssen, Neocon Bagman Who Runs Bogus Human Rights Foundation." (The word "high" was doubly scandalous as it alluded to both embezzlement and drug use.)

35. Byline's founder and editor, Daniel Tudor, was appalled. He told Halvorssen: "I find it a spectacularly unfair article… and I personally think the right thing to do is to take it down." He did so, after which he profusely apologized.

36. Undaunted, Silverstein went elsewhere.  He changed the title to: "Meet Thor Halvorssen, Neocon Scam Artist Who Heads Bogus Human Rights Foundation" and published it on Shawdowproof.com on September 28, 2015.  *See* Ex. B.  The article stated Halvorssen was "trashed on drugs at human rights events," regularly commits financial crimes through the Foundation to maintain a "sweet life," including the alleged ownership of properties in New York, Florida, and California. It further stated that Halvorssen is a pedophile (and "brags" about it) and did not actually graduate from the University of Pennsylvania.  It further stated that Halvorssen had been

romantically involved with Peter Thiel and was his kept man.  All of these charges

are false, but if true would be grounds for termination by the Foundation.

37. Silverstein, with Simpson and Fritsch's approval, then amplified the false allegations

on Facebook. Silverstein added specificity and detail to the false allegations including

that Halvorssen had been to a drug rehabilitation facility in Tennessee for the

treatment of "heroins" and that his stay had been financed by Peter Thiel. These are

all false statements.

38. One Silverstein post stated Halvorssen "used [the Foundation's] money to pay for

very inappropriate conduct."   *See* Ex. B, September 24, 2015.

39. He repeated this the following day referring to Halvorssen's "abuse of human rights

cash and advocacy." *See* Ex. B, September 25, 2015.

40. Two days later he again accused Halvorssen of "using his group's money to fund

chronic drug abuse and underage sex." *See* Ex. B, September 27, 2015.

41. And on October 1, 2015 he made the outrageous and damaging assertion that

Halvorssen was a heroin addict and had been in rehab in Tennessee. *See* Ex. B,

October 1, 2015.

42. The next day he accused Halvorssen of having a "strange predilection for teenagers."

*See* Ex. B, October 2, 2015.

43. The sole purpose of the Shadowproof article and Facebook posts, as Silverstein knew

from his friends Simpson and Fritsch, who had solicited him for the Derwick

engagement, was to retaliate against Halvorssen for reporting the Venezuelans'

crimes by getting him fired from the Foundation.

44. Fritsch and Simpson then engaged in "search engine optimization" in order to ensure that the Silverstein article would appear on the first page of any internet search for Halvorssen and the Foundation. The objective was to pressure the Foundation to fire Halvorssen.

45. Fritsch also met with Wall Street Journal reporter Jose De Cordoba and encouraged him to use the Fusion GPS dossier and the Silverstein article in any reporting about the allegations against Derwick and the Venezuelans.

46. Silverstein has continued to attack Halvorssen online. On October 26, 2017, he stated in his blog that Halvorssen lied to the U.S. Senate. The same post also attacked William Browder as a "fraud." (More details regarding Browder will be stated below.)

47. For their part in executing the conspiracy, D'Agostino, Convit, Betancourt, and Trebbau provided a copy of the Fusion GPS dossier to members of the Venezuelan government, including Diosdado Cabello (currently the second most powerful man in the Venezuelan government and on the list of U.S.-sanctioned officials) and Henry Ramos-Allup (the notoriously corrupt member of the Venezuelan legislature who is D'Agostino's brother-in-law). Both Cabello and Ramos-Allup used the contents of the Fusion GPS dossier to inveigh against Halvorssen on Venezuelan television and in Venezuelan media.

48. This conspiracy to retaliate against Halvorssen for his report to federal law enforcement officials about the Derwick bribes and money laundering violated 18 U.S.C. §§1513(e) and (f), which states, in pertinent part:

> Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or

> livelihood of any person, for providing to a law enforcement officer any
> truthful information relating to the commission or possible commission of
> any Federal offense, shall be fined under this title or imprisoned not more
> than 10 years, or both.
> …
> Whoever conspires to commit any offense under this section shall
> be subject to the same penalties as those prescribed for the offense
> the commission of which was the object of the conspiracy.

49. Although the Foundation did not fire Halvorssen, the conspiracy was successful in

harming Halvorssen's ability to earn income. Beyond lost speaking fees, a

prospective contract he had with a New York-based venture capital firm, Social

Impact Capital, was canceled once the firm's principals read the Silverstein article.

Halvorssen was to have become a partner in the firm with a guaranteed annual salary

and a fixed percentage of the firm's returns. The firm's sole reason for its decision not

to do business with Halvorssen was the Silverstein article, which it found online. This

has cost Halvorssen at least $5 million in lost income.

VI.   Simpson and Fritsch's Pattern of Retaliating
Against Other Whistleblowers

a.   Retaliation Against William Browder

50. Mr. Browder is an American-born British citizen with a successful career as an

investment banker based in London. He is the principal of Hermitage Capital

Management ("Hermitage"), which for many years was the largest foreign investor in

Russia. He has become a world renowned anti-corruption campaigner and was

similarly targeted by Fusion GPS.

51. In 2008, Browder's Moscow-based tax specialist, Sergei Magnitsky, discovered a
$230 million tax fraud scheme carried out by corrupt Russian government officials
and their cronies in the private sector ("the Russians") against the Russian treasury.

52. Magnitsky filed a detailed criminal complaint with seven different Russian
government agencies and testified to Russian prosecutors about the scam. Days later,
Magnitsky was arrested and turned over to the very officials and investigators he had
accused of fraud. He was subsequently charged with having carried out the fraud he
exposed. He was placed in pre-trial detention in a Moscow prison.

53. In November of 2009, Magnitsky died in prison after being beaten to death by prison
guards.

54. Thereafter, Browder began a worldwide lobbying campaign for the enactment of
sanctions against the Russians who were responsible for the murder, known as the
Magnitsky Act. It was enacted by the U.S. Congress and signed into law by President
Obama in 2012. Subsequent laws, also sanctioning corrupt Russian government
officials, have been passed in several European countries.

55. As part of his activities in the campaign "Justice for Sergei," Browder continued to
focus media and law enforcement attention on the theft of the $230 million.

56. One of the entities used to launder a part of the stolen funds was Prevezon Holdings
Ltd. ("Prevezon"), which, among other things, invested the stolen funds in Manhattan
real estate.

57. In 2013, Browder reported the money laundering to special agent Todd Hyman of the
U.S. Department of Homeland Security, Immigrations and Customs Enforcement
(ICE). ICE found Browder's report to be credible and, based largely on his report and

15

the documents he provided, began a civil forfeiture proceeding against Prevezon
Holdings Ltd. and affiliated entities.

58. Meanwhile, Browder's campaign for the Magnitsky Act earned worldwide acclaim.

59. Shortly after the U.S. government filed the action, Prevezon's Russian lawyer Natalya
Veselnitskaya, hired Fusion GPS to serve as public relations counsel for the Russian
government officials impacted by the Prevezon matter. (It should be noted that in
April of 2018 Veselnitskaya publicly acknowledged her ties to the government of
Vladimir Putin by admitting that she was a government agent.)

60. Veselnitskaya also ordered Simpson and Fritsch to investigate Browder, assemble a
dossier on him, and use the dossier to retaliate against him for his reporting
Prevezon's crimes to the U.S. authorities. The goal of the retaliation was to cause
Hermitage's investors to withdraw their investments, which would devastate the Fund
and harm Browder by costing him significant income and his job. Simpson and
Fritsch accepted.

61. Simpson disseminated the information in this dossier in journalistic circles in 2015
and 2016 to harm Browder as detailed above.

62. Simpson told journalists that Browder was carrying out a con by claiming that
Hermitage had been falsely used to defraud the Russian government. According to
Simpson, it was Browder who had carried out a tax fraud. Simpson also told several
journalists that Browder had been "in contempt of congress" by carrying out a
fraudulent campaign on behalf of Sergei Magnitsky. The scurrilous information was
spread to journalists for the objectives of harming Hermitage and Browder, as stated
above.

16

63. Simpson provided the Fusion GPS dossier about Browder to a former member of the Russian intelligence services, Rinat Akhmetshin, who subsequently provided the information to Russia's chief prosecutor with the aim of abetting further prosecutions of Browder and forcing the collapse of Hermitage.

64. Simpson and Fritsch were also involved in the promotion of an anti-Browder documentary, *Magnitsky Act: Behind the Scenes,* which was prominently screened at the Newseum in Washington, D.C. in 2016 and in many other influential venues around the world with the goal of harming Browder by falsely accusing him of being a criminal and a tax cheat. Again, the goal of the scheme, was to get Hermitage's investors to realize that Browder is a liability.

65. The civil forfeiture case against Prevezon Holdings resulted in a $5.9 million settlement of the money laundering allegations, vindicating Browder's report of crimes by the Russians.

b.   Retaliation Against Aleksander Boyd

66. Boyd is a Venezuelan-born Spanish citizen and a prominent journalist reporting on corruption and human rights violations in that country and elsewhere. He has been widely published and quoted all over the world as an expert in corruption. Boyd has focused heavily on the Venezuelans and Derwick, reporting their kickbacks for energy contracts and their other financial illegal activities in the oil and gas space as well as their financial shenanigans in the United States. Boyd is the single most significant adversary Derwick has encountered in the media. Boyd published and widely reported his findings to U.S. government officials, including the U.S.

Department of State, the U.S. Treasury Department, the Federal Bureau of
Investigation, and the U.S. Department of Homeland Security on a weekly basis.

67. Boyd reported to U.S. officials all manner of documents, turbine proposals, invoices
from Derwick to the Venezuelan government, and even purchase orders from
Venezuela's state-owned oil monopoly, PDVSA, to Derwick. Boyd continued to
provide scores of leaked documents from inside Derwick and its affiliated companies.

68. In 2014, the Venezuelans retained Fusion GPS to smear Boyd because they knew
U.S. law enforcement officials were reviewing information about Derwick Associates
provided by Boyd.

69. Fritsch, with Simpson's approval, traveled to Caracas to meet with the Venezuelans
on several occasions, including a visit that took place in July of 2014. Fritsch stayed
at the Hotel Lido, across the street from the Derwick offices of the Venezuelans.
Fritsch met with the Venezuelans at the Derwick offices in the Kyra building of the
Campo Alegre neighborhood of Caracas. During this meeting, Fritsch discussed the
campaign against Boyd. The Venezuelans subsequently communicated with Fritsch
after his return to the United States and approved the effort to retaliate against Boyd.
Their goal was to discredit his work so that he could no longer obtain online
donations from the public to continue his investigations and blogs.

70. Simpson and Fritsch then produced a "dossier" that would serve as a template for
smear articles that would ruin Boyd's livelihood. They disseminated this dossier to
their journalistic friends. As in the case of Halvorssen, the dossier was also provided
to members of the Venezuelan government including D'Agostino brother-in-law, the
politician Henry Ramos-Allup, who promptly wrote vicious smears of Boyd in the

18

Venezuelan media referring to him as a drug trafficker, car thief, rapist, and wanted criminal.

71. Dozens of blogs and websites and videos were published, almost overnight, that contained false police files and false arrest records suggesting Boyd was a criminal, bogus police mugshot photographs, and narratives which called him a pedophile, a drug addict, car thief, rapist, and embezzler. Many of these blogs were in Spanish. The allegations in these articles bear an uncanny similarity to the accusations made against Halvorssen, both in terms of their horrific nature as well as their falsity.

72. Additionally, a part of the retaliation campaign involved the burglary of Boyd's London home on November 17, 2014. Three professionals broke into Boyd's central London apartment. The three men ignored other valuables and restricted themselves to taking Boyd's two laptop computers so that he could no longer pursue his career as a blogger. Since then, Convit has been publishing private information about Boyd obtained from his laptops. Convit's sole motive appears to harm Boyd's credibility as a blogger and destroy his livelihood. On information and belief, Simpson and Fritsch knew about and approved of the burglary as a part of the retaliation campaign to stop and punish Boyd's whistleblowing against the Venezuelans.

          c. A Pattern of Retaliation Against Whistleblowers

73. To summarize, Simpson and Fritsch have been engaged in a pattern of violations of 18 U.S.C. §1513(e) and (f) against Halvorssen, Browder, and Boyd from 2014 to October 2017. Several were committed against Halvorssen from 2015 to 2017.

74. These violations were all undertaken at the behest of Fusion GPS clients after these three whistleblowers had reported alleged crimes to federal law enforcement officials.

The Venezuelans joined this conspiracy in 2014 in order to harm Boyd and then
Halvorssen.

### COUNT I: THE DEFENDANTS HAVE VIOLATED 18 U.S.C. §1962(d)

75. Each Defendant is a "person" pursuant to 18 U.S.C. §1961(3).

76. Bean LLC is a Delaware limited liability company doing business as Fusion GPS at
1700 Connecticut Av., Suite 400, Washington, D.C. It has clients throughout the
nation and the world. It affects interstate commerce and is a RICO enterprise pursuant
to 18 U.S.C. §1961(4).

77. Simpson is the majority owner of Fusion GPS as well as an officer of the company.
Fritsch is also an owner and officer of the company. They work closely together in
the company business.

78. By agreeing with each other to conduct the three retaliation schemes detailed above,
Simpson and Fritsch have formed a conspiracy to commit an ongoing pattern of
racketeering beginning in 2014, because 18 U.S.C. §1961(1)(B) of RICO incorporates
18 U.S.C. §1513 as a type of "racketeering activity."

79. D'Agostino, Betancourt, Trebbau, and Convit joined the conspiracy when they hired
Fusion GPS, through Simpson and Fritsch, to retaliate against Boyd and Halvorssen.
Silverstein also joined the conspiracy to retaliate against Halvorssen, though he is not
sued.

80. The related Scheme against Boyd was carried out by disseminating the false
information about him on the internet through social media websites and the burglary
of his apartment. The scheme against Halvorssen was carried out by having
Silverstein write a hit piece about Halvorssen to harm him, disseminating it widely on

the internet, and following it up with salacious Facebook and Twitter posts. Simpson and Fritsch oversaw every aspect of these similar smears. And when Silverstein agreed to write the article, he knew that Simpson and Fritsch were going to use it to retaliate against Halvorssen for his whistleblowing to federal officials.

81. The Defendants' agreement to violate 18 U.S.C. §§1513(e) and (f) is a conspiracy to violate 18 U.S.C. §1962(c). Thus, each Defendant has violated 18 U.S.C. §1962(d), which states, in pertinent part: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection... (c) of this section."

82. This is a pattern of racketeering activity, pursuant to 18 U.S.C. §1961(5). It occurred from 2014, when Simpson and Fritsch began retaliating against Browder and Boyd, through Fusion GPS, and continued to October 2017, the last known attack by co-conspirator Silverstein on Halvorssen and Browder.  Indeed, smearing opponents of its clients seems to be Fusion GPS' regular way of doing business.

83. Halvorssen has been directly and proximately injured by one of the acts in this pattern, the publication of the article about him by co-conspirator Silverstein at the behest of the other defendants. This has cost Halvorssen at least $5 million in lost income, an injury to his "business or property" within the meaning of 18 U.S.C. §1964(c).

84. WHEREFORE, pursuant to §1964(c), Mr. Halvorssen demands judgment against the Defendants for three times his damages, at least $15 million, plus pre-judgment interest, taxable costs, and reasonable attorney's fees against each and every Defendant joint and severally. He also demands an injunction against the Defendants from further RICO violations.

85. Plaintiff also requests a jury trial.

Dated: May 10, 2018

By: /s/ Javier El-hage
Carlos Javier El-Hage Guaristi
1 West St., Suite 3501
New York, N.Y. 10004
(917) 514-9895
Javier@ElHagepllc.com
E.D.N.Y. Bar #CG6719

Howard W. Foster
Foster PC
150 N. Wacker Dr., Suite 2150
Chicago, IL 60606
(312) 726-1600
HFoster@Fosterpc.com
*Pro Hac Vice Motion pending*

Attorneys for Plaintiff Thor Halvorssen