UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
THOR HALVORSSEN,

                      Plaintiff,

-against-

GLENN R. SIMPSON, PETER FRITSCH,
FRANCISCO D'AGOSTINO-CASADO,
LEOPOLDO A. BETANCOURT-LOPEZ,
PEDRO JOSE TREBBAU-LOPEZ, and
FRANCISCO CONVIT-GURUCEAGA,

                      Defendants.
------------------------------------------------------------ x

MEMORANDUM & ORDER

2:18-cv-2683 (ENV) (RLM)

VITALIANO, D.J.

      Thor Halvorssen filed this action against Francisco D'Agostino-Casado ("D'Agostino"), Leopoldo Betancourt-Lopez ("Betancourt"), Pedro Jose Trebbau-Lopez ("Trebbau"), Francisco Convit-Guruceaga ("Convit"), Glenn Simpson and Peter Fritsch, alleging civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq. See* Dkt. 1 ("Compl."). Three defendants (the "moving defendants"), Simpson, Fritsch, and D'Agostino, move to dismiss, under Federal Rule of Civil Procedure 12(b)(6). *See* Dkts. 75-1 ("Simpson-Fritsch Mem."); 79-1 ("D'Agostino Mem."). For the reasons set forth below, the motions are granted.

## Background[1]

      Halvorssen is the President of the Human Rights Foundation and "an outspoken and

---

[1] The background facts are taken from the complaint and the attached exhibits. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); Fed. R. Civ. P. 10(c) ("A copy of a written

1

continuous critic of corruption in his native Venezuela." Compl. at 1. In July 2015, he became a shareholder of a Texas-based energy company, Harvest Natural Resources, Inc. ("Harvest"). *Id.* ¶ 15. On August 6, 2015, he wrote to Harvest's board of directors (the "board") to express his objection to the nomination of D'Agostino for board membership. *Id.*; *see id.* Ex. A (the "Harvest letter"). D'Agostino was a co-owner of Derwick Associates ("Derwick"), a Venezuelan energy company specializing in power plant construction. Compl. ¶ 2. In the letter, Halvorssen also objected to the proposed purchase of roughly 34 million shares of Harvest common stock by CT Energy, "a Venezuelan-Italian consortium," and the forging of "a strategic partnership" allowing CT Energy's holding company to "oversee [Harvest's] Venezuela operations." Harvest Letter at 1. The Harvest board had recommended that shareholders approve the CT Energy transaction and appoint D'Agostino as a board member based on his "deep knowledge of Venezuela." *Id.*

In the Harvest letter, Halvorssen asserted that D'Agostino had told him "that he and his associates, through Derwick, have made bribery payments to Venezuelan officials in connection with the award of certain government energy contracts there." Harvest Letter at 1. Beyond that alleged disclosure, Halvorssen elaborated, a Wall Street Journal article had revealed that Derwick was "under investigation by the United States Department of Justice ["DOJ"], . . . the Manhattan District Attorney's ["DA's"] Office. . . . [and] by Sepblac, Spain's Financial

---

instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). All facts alleged in plaintiff's pleadings are taken as true and all reasonable inferences are drawn in his favor. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

Intelligence Unit and Anti-Money Laundering Supervisory Authority" based on allegations that Derwick had funneled more than $1 billion earmarked for construction of power plants in Venezuela into foreign bank accounts, including in the United States. *Id.* That article also reported that D'Agostino had been named as a defendant in a civil RICO lawsuit filed by Otto Reich, the former United States ambassador to Venezuela.[2] *Id.* at 2. Halvorssen brought this information to the board's attention, he wrote, in light of the danger that, if voted onto the board without "full vetting," D'Agostino would increase Harvest's exposure to "very significant fines and other penalties, including criminal penalties," under the Foreign Corrupt Practices Act ("FCPA"). *Id.*

Not content to serve as mere messenger, Halvorssen demanded "an independent investigation" into D'Agostino as well as the proposed CT Energy transaction. *Id.* He warned the board that "shareholders will hold you accountable for any destruction in value that results from your inaction on this matter." *Id.* Driving the point home, he cc'd several federal officials on the letter, including the United States Attorney for the Southern District of New York and senior officials in the Securities and Exchange Commission ("SEC"), the DOJ Criminal Division, Immigration and Customs Enforcement ("ICE"), and the Department of the Treasury ("DOT"). *Id.* Although D'Agostino was still elected to the board, Harvest retained external counsel to investigate him. As a result of that investigation, D'Agostino "was forced to resign

---

[2] Reich's RICO claims, however, had already been dismissed, in a decision later affirmed by the Second Circuit in May 2017. *See Reich v. Lopez*, 858 F.3d 55, 62 (2d Cir. 2017) (upholding dismissal of RICO claims for failure to allege horizontal relatedness and continuity), *cert. denied*, 138 S. Ct. 282, 199 L. Ed. 2d 127 (2017).

3

from the [board] several weeks after having been elected." Compl. ¶ 16.

What followed, according to Halvorssen, was a revenge plot pulled, seemingly, from the reels of cinema noir. Halvorssen alleges that, starting in August 2015, D'Agostino spearheaded a scheme to retaliate against him for sending the Harvest letter, conspiring with fellow Derwick co-owners Betancourt, Trebbau, and Convit (collectively, the "Venezuelans"). *Id.* ¶¶ 2, 24. The Venezuelans retained Simpson and Fritsch, principals of opposition research and strategy firm Fusion GPS, "to produce a false dossier and a media campaign (including a social media campaign) to depict Halvorssen as a pedophile, heroin addict, and embezzler of the Foundation's money." *Id.* ¶¶ 3, 25. Their ultimate goal, Halvorssen claims, was to cause his termination from the Human Rights Foundation and, more broadly, sideline his career as a human rights activist and critic of Venezuelan corruption. *Id.* ¶ 27.

As part of this smear campaign, Halvorssen asserts, Fusion GPS compiled a dossier of false allegations against him, promising sources "anonymity and encourag[ing] [them] to exaggerate and speculate." *Id.* ¶ 30. Simpson and Fritsch then turned the dossier over to the Venezuelans and non-party journalist Kenneth Silverstein, who wrote what Halvorssen essentially describes as a hit piece against him. *Id.* ¶ 32. Silverstein's article, entitled "Meet Thor Halvorssen, Neocon Scam Artist Who Heads Bogus Human Rights Foundation," was published on the blog shadowproof.com on September 28, 2015. *Id.* ¶ 36; *id.* Ex. B at 1-7 (the "Silverstein article"). The Silverstein article lodged a number of accusations against Halvorssen, which, he claims, are false, including charges that he "has been repeatedly trashed on drugs at human rights and other political events", "publicly brag[ged] about having sex with teenagers", and had lied about having obtained his bachelor and master's degrees from the University of Pennsylvania. Silverstein article at 3-5.

4

Next, Halvorssen alleges, Fritsch and Simpson "engaged in 'search engine optimization' in order to ensure that the Silverstein article would appear on the first page of any internet search for Halvorssen and the Foundation," as a way "to pressure the Foundation to fire Halvorssen."[3] Compl. ¶ 44. He complains that, "[a]lthough the Foundation did not fire [him], the conspiracy was successful in harming [his] ability to earn income," causing him to lose "speaking fees, [and] a prospective contract he had with a New York-based venture capital firm, Social Impact Capital." *Id.* ¶ 49.

Halvorssen connects this alleged plot against him to actions taken by Fusion GPS against journalist Aleksander Boyd and investment banker William Browder, who are not parties to this action, alleging that the incidents demonstrate a pattern of retaliation for reporting corruption to federal law enforcement. *Id.* at 14, 17. As for Boyd, Halvorssen alleges that he investigated Derwick's "kickbacks for energy contracts and . . . other financial illegal activities" in both Venezuela and the United States, making weekly reports on his findings, supported by leaked documents, to the Department of State, DOT, FBI, and Department of Homeland Security ("DHS"). *See id.* ¶¶ 66-67. In response, "the Venezuelans retained Fusion GPS to smear Boyd." *Id.* ¶¶ 68-71. As for Browder, Halvorssen alleges that he reported money laundering by Prevezon Holdings, Ltd. ("Prevezon"), in connection with a Russian tax fraud scheme tied to the death of Sergei Magnitsky, to DHS special agent Todd Hyman, leading to the initiation of a federal forfeiture proceeding against Prevezon. *Id.* ¶¶ 53-57. As a result, Simpson and Fritsch were retained to spread false information about Browder in order to prompt investors to

---

[3] Search engine optimization aims to increase traffic to a website by increasing its visibility in search engine results.

withdraw from his firm. *Id.* ¶ 60.

Halvorssen initiated this action, on May 10, 2018, asserting a single RICO conspiracy claim. *Id.* at 20-21.

## Standard of Review

In order to survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). On a Rule 12(b)(6) motion, a court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Vietnam Ass'n for Victims of Agent Orange*, 517 F.3d at 115. Of course, in deciding a Rule 12(b)(6) motion, a court may consider documents that are attached to or referenced in the complaint, documents that the plaintiff relied on in bringing suit, and matters of which judicial notice may be taken. *Chambers*, 282 F.3d at 152-53.

With respect to the substance of Halvorssen's claim, "RICO is a broadly worded statute that 'has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce.'" *Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir. 2001) (quoting S.Rep. No. 91–617, at 76 (1969)). As part of that mission, "RICO imposes [civil] liability on individuals working for an 'enterprise' that commits certain predicate crimes that amount to a 'pattern of racketeering activity.'" *Reich*, 858 F.3d at 59 (quoting 18 U.S.C. §§ 1962, 1964). Specifically, § 1962(c) of

the RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c); *see also Aliev v. Borukhov*, No. 15-CV-6113 (ERK) (JO), 2016 WL 3746562, at *4 (E.D.N.Y. July 8, 2016) (noting that § 1962(c) "was intended to prevent the operation of a legitimate business or union through racketeering"). Section 1962(d), the provision under which Halvorssen asserts his claim here, prohibits conspiracy to commit a substantive RICO offense. 18 U.S.C. § 1962(d).

Courts have cautioned, however, that RICO is widely recognized as "an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (citation omitted), *aff'd*, 113 F.3d 1229 (2d Cir. 1997). Given the "powerful incentive for plaintiffs to attempt to fit garden variety fraud claims within the standard of civil RICO" due to "the allure of treble damages, attorney's fees, and federal jurisdiction," courts must "scrutinize civil RICO claims early in the litigation to separate the rare complaint that actually states a claim for civil RICO from that more obviously alleging common law fraud." *Holmes v. Parade Place, LLC*, No. 12-CV-6299 (GBD) (DF), 2013 WL 5405541, at *14 (S.D.N.Y. Sept. 26, 2013) (citation omitted); *see also Olympicorp Int'l, LLC v. Farm Rich Foods, LLC*, No. 13-CV-4094 (ENV), 2013 WL 6194238, at *2 (E.D.N.Y. Nov. 25, 2013) (observing that RICO, when "often invoked inappropriately," becomes "a mere saber to be rattled"); *Gross v. Waywell*, 628 F. Supp. 2d 475, 480 (S.D.N.Y. 2009) (surveying civil RICO cases resolved on the merits in the Southern District of New York between 2004 and 2007 and finding that no RICO plaintiffs succeeded).

Discussion

To plead a civil RICO claim, a plaintiff must show: "(1) a violation of the RICO statute; (2) an injury to business or property; and (3) that the injury was caused by the violation of § 1962." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). To state a violation of § 1962(c), a plaintiff must allege "'(1) that the defendant (2) through the commission of two or more [predicate] acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affects interstate or foreign commerce." *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 443 (S.D.N.Y. 2004) (quoting *Moss v. Morgan Stanley*, 719 F.2d 5, 17 (2d Cir. 1983)).

I. Pattern of Racketeering Activity[4]

Even assuming *arguendo* that he has plausibly pleaded two or more RICO predicate acts, Halvorssen must establish that those acts constituted a pattern of racketeering activity, meaning "a series of related predicates that together demonstrate the existence or threat of continued criminal activity." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2096-97, 195 L. Ed. 2d 476 (2016). The elements of relatedness and continuity prevent the use of RICO to target mere "sporadic activity" or "separated and isolated" criminal acts. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989) (citation omitted). These

---

[4] For the purpose of the RICO pattern analysis, the Court assumes, without deciding that he has done so plausibly, that Halvorssen has alleged multiple predicate acts of retaliation under 18 U.S.C. § 1513(e), which prohibits retaliation against a person "for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense."

requirements are interpreted strictly where, as in this case, the enterprise, as pleaded in the complaint and viewed in the light most favorable to plaintiff, is an entity whose activities are primarily carried out for legitimate business purposes, as opposed to a primarily criminal enterprise. *See Reich*, 858 F.3d at 61.

*A. Relatedness*

Relatedness, in turn, has two parts: "[p]redicate crimes must be related both to each other (termed 'horizontal relatedness') and to the enterprise as a whole ('vertical relatedness')." *Reich*, 858 F.3d at 60 (citation omitted). The moving defendants limit their challenge to horizontal relatedness, arguing that the retaliatory schemes against Halvorssen, Boyd, and Browder are not sufficiently related because they targeted different people, for different reasons. Simpson-Fritsch Mem. at 19.

Predicate acts "are horizontally related when they: 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Reich*, 858 F.3d at 61 (emphasis omitted) (quoting *H.J.*, 492 U.S. at 240). Halvorssen argues that all three schemes "were taken for the same purpose: to retaliate against whistleblowers who complained about clients of Fusion GPS." Dkt. 76 ("Opp'n") at 16.

Framing "purpose" in this broad a manner, however, drains the relatedness analysis of its substance. *See Reich*, 858 F.3d at 61-62 (concluding predicates were not horizontally related where alleged purpose of "help[ing] Derwick" was so general as to "make the factor meaningless: virtually all crimes committed on behalf of an enterprise are done to help it"). Narrowing purpose, *i.e.*, to acts advancing the interests of the Venezuelans, it becomes sufficiently specific as to retain meaning, though then limited to the alleged schemes against

9

Halvorssen and Boyd.

Halvorssen's allegations as to the result factor are also quite general. He pleads that the three schemes all caused financial losses. As for Halvorssen himself, those losses came in the form of lost potential speaking fees and employment opportunities. As for Browder, Halvorssen alleges defendants' acts endangered Browder's investment fund, but without resulting in any losses. In the same vein, Halvorssen alludes to financial harm to Boyd, but only sets forth allegations as to generalized reputational harm as a result of the publication of "private information about Boyd obtained from his [stolen] laptops." *See* Compl. ¶¶ 49, 63, 72. Halvorssen does not point to any resulting financial harm as to Boyd. Thus, his similar results argument is also flawed.

To be sure, the complaint is not wholly devoid of allegations that speak to horizontal relatedness. The gravamen of Halvorssen's grievance is that he and Boyd were targeted by the Venezuelans for reporting on Derwick's illicit conduct, through Fusion GPS's purposeful dissemination to journalists of false information for publication. The distinguishing characteristics of these schemes—including the purposes, participants and methods of commission—overlap significantly. Halvorssen's allegations regarding Browder, though, overlap to a much lesser degree; he concedes that the Venezuelans were not involved in that alleged scheme, which did not involve the publication of false allegations against Browder nor demonstrate other characteristics suggesting interrelation with the acts against Halvorssen and Boyd.[5]

---

[5] Halvorssen argues that the method of commission was the same, because each predicate act is

At this point in the analysis, the fact that the alleged enterprise was created and operated primarily for business purposes takes on dispositive significance. "[W]here the enterprise in question is not primarily in the business of racketeering," overlapping participants, without more, are insufficient to show horizontal relatedness. *Reich*, 858 F.3d at 62 (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997) (holding that predicate acts were unrelated despite an overlap of participants)). The Court concludes, then, that Halvorssen has pleaded horizontal relatedness among the predicate acts targeting him and Boyd, but not Browder. Accordingly, the Browder plot is excluded from the remainder of the analysis of Halvorssen's RICO claim. *See H.J.*, 492 U.S. at 242 (explaining that RICO continuity may be proven by "*a series of related predicates* extending over a substantial period of time" (emphasis added)).

### B. Continuity

Continuity requires a different analytical lens, but, of course, it too is focused on the facts alleged in the complaint. In his complaint, Halvorssen has proceeded only on a theory of closed-ended continuity, *see* Opp'n at 19 n.11, meaning that the predicate acts encompass "a closed period of repeated conduct" rather than "past conduct that by its nature projects into the future with a threat of repetition." *H.J.*, 492 U.S. at 241. Although closed-ended continuity also involves factors including "the number and variety of predicate acts and the number of participants," it is "primarily a temporal concept," measured by "the time during which RICO

---

alleged to have violated § 1513(e). Opp'n at 16. However, this argument confuses the RICO predicate statute with the method of commission; simply put, retaliation may be carried out through a variety of methods that may or may not demonstrate horizontal relatedness.

predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool*, 520 F.3d at 184 (citations omitted). A plaintiff must allege that the related predicates extended "over a substantial period of time," which the Second Circuit has interpreted to require a minimum period of two years. *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999); *see also Spool*, 520 F.3d at 184 ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where . . . '[t]he activities alleged involved only a handful of participants' and do not involve a 'complex, multi-faceted conspiracy.'" (citation omitted)).

Fatally, Halvorssen fails to allege predicate acts taking place over a substantial period of time. The Silverstein article was published in September 2015, and Silverstein's accompanying Facebook posts over the course of September and October 2015. Halvorssen tries to tack on another critical blog post by Silverstein, published in October 2017, but does not allege that it was connected with defendants or the alleged enterprise in any way.[6] Compl. ¶ 46. Halvorssen

---

[6] Halvorssen insists that continuity has been shown because the conspiracy against him "continues to this day, until it achieves its objective of getting the Foundation to fire [him]." Opp'n at 20. However, he has not alleged any *predicate acts* continuing "to this day." Thus, rather than demonstrate a continuous pattern of racketeering, that assertion only highlights another fatal deficiency in his pleading—his failure to allege proximate cause, an essential element of civil RICO. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120-24 (2d Cir. 2003) (RICO requires showing that "defendant's injurious conduct is both the factual and the proximate cause of the injury alleged"). Proximate cause under RICO requires "some *direct* relation between the injury asserted and the injurious conduct alleged," *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992) (emphasis added), going beyond the "remote, purely contingent, or indirect," *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010)). "[E]ven at the pleading stage, civil

also alleges that defendants caused the burglary of Boyd's home in November 2014 as "a part of the retaliation campaign," as well as the publication of multiple blog posts containing false allegations against him, but he does not indicate when those posts were made. *Id.* ¶¶ 69-72.

Thus, the Court determines, the specific predicate acts alleged in the complaint took place less than a year apart, between November 2014 and October 2015; this period falls far short of the substantiality requirement as understood in the Second Circuit, especially given the lack of other factors supporting closed-ended continuity.[7] *See, e.g., Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 414 (S.D.N.Y. 2013) ("Viewed against the body of RICO case

---

RICO's direct relation requirement is rigorous and requires dismissal where substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury." *Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 276-77 (S.D.N.Y. 2019) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 126 S. Ct. 1991, 164 L .Ed. 2d 720 (2006)). Halvorssen alleges that he lost unspecified speaking fees and a prospective contract with Social Impact Capital, because defendants engaged in "search engine optimization" to ensure that the Silverstein article would be one of the first results for any internet search regarding Halvorssen and the Foundation. However, he does not contend that defendants took any direct steps to expose his potential business partners to the Silverstein article. Furthermore, although he asserts that the principals of Social Impact Capital saw the article and, solely on the basis of the article, decided not to do business with him, he does not support that conclusory assertion with any factual allegations demonstrating a direct link. Even if he did, he does not account for Social Impact Capital's status as a third party, whose independent action interrupts the causal chain to defendants' conduct. Without more, Halvorssen's attenuated theory of causation would turn any individual or entity's decision not to do business with him after September 2015 into a cognizable injury for RICO purposes—triggering the thermonuclear device. In any event, "generalized reputational harms . . . including the risk of future lost business commissions, are too speculative to constitute an injury to business or property" for RICO purposes. *Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16 (2d Cir. 2006) (summary order) (citing *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990)).

[7] Even if the Court were to include the Browder plot, Halvorssen alleges the constituent acts took place "in 2015 and 2016" without specifying any dates or even book-ending this period by month. *See* Compl. ¶ 61. Such allegations do not tip the substantiality analysis in his favor. Dismissal would still be warranted.

13

law in this District, Plaintiffs' allegations of a scheme involving a small number of victims and participants and spanning a limited time frame do not satisfy the requirement of closed-ended continuity."); *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 257 (S.D.N.Y. 2002) (dismissing for lack of closed-ended continuity where, despite 7-year duration of scheme, "none of the (other) indicia of closed-ended continuity—*i.e.* a large number and variety of predicate acts, a large number of either participants or victims, and the presence of separate schemes" was present). In short, RICO targets conduct "of sufficiently serious dimensions and degree, both qualitatively and quantitatively, not only to cause the private injury the victim claims, but to produce some public harm or pose a societal threat that extends beyond the narrow interests of a few victims or the limited scope of some RICO predicate acts." *Gross*, 628 F. Supp. 2d at 490. Guided by the light of precedent, Halvorssen, plainly, has failed to allege facts supporting its application here.

Having failed to allege a pattern of racketeering activity, Halvorssen cannot establish a substantive RICO violation. Consequently, his conspiracy claim must be dismissed.[8] *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004).

---

[8] In light of the fatal deficiencies in pleading a pattern of racketeering activity and proximate cause, the Court need not, and does not, reach the moving defendants' remaining arguments.

## Conclusion

In line with the foregoing, the motions to dismiss are granted. The complaint, therefore, is dismissed with prejudice.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York

August 9, 2019

/S/ USDJ ERIC N. VITALIANO
ERIC N. VITALIANO
United States District Judge